AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

JUN 0 1 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

One Apple I-Phone 7, black, Model A1784,
FCC ID: BCG-E3092A

)
)
)
)
)

Case No.

**18MJ2958**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, which is incorporated by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, which is incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC § 952/960/963 | Importation of a controlled substance and conspiracy |

The application is based on these facts:
See Affidavit of Sean Kelly, Special Agent of the Federal Bureau of Investigation, which is hereby inorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Sean Kelly, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/1/18

City and state: San Diego, CA

*Judge's signature*

Mitchell D. Dembin, Magistrate Judge
*Printed name and title*

1 | **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

2 |     I, SEAN KELLY, Special Agent of the Federal Bureau of Investigation, being duly
3 | sworn, hereby state as follows:

4 | **INTRODUCTION**

5 |     1.    I make this affidavit in support of an application for a warrant to search a black
6 | Apple I-Phone 7, Model A1784, FCC ID: BCG-E3092A (hereinafter "**Target Device"),**
7 | described in Attachment A (incorporated herein by reference), which was seized from
8 | JOHN LEE BISHOP on December 11, 2017, incident to his arrest for Importation of
9 | Marijuana at the San Ysidro, California Port of Entry (POE) and which is currently held as
10 | evidence by the Federal Bureau of Investigation, San Diego Division, Evidence Control
11 | Unit, located at 10385 Vista Sorrento Parkway, San Diego, California 92121.

12 |     2.    I seek authority to search the **Target Device** for evidence from April 1, 2016
13 | through December 11, 2017 of crimes, specifically, violations of Title 21, United States
14 | Code, Sections 952, 960 and 963, as described in Attachment B (incorporated herein by
15 | reference.)

16 |     3.    The information contained in this affidavit is based upon my experience and
17 | training, and in consultation with other federal, state, and local law enforcement agents.
18 | The evidence and information contained herein was developed from interviews and my
19 | review of documents and evidence related to this case. Because this affidavit is made for
20 | the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain
21 | all of the information known by me or other federal agents regarding this investigation, but
22 | only contains those facts believed to be necessary to establish probable cause. Dates, times
23 | and amounts are approximate.

24 | **EXPERIENCE AND TRAINING**

25 |     4.    I am an investigative or law enforcement officer within the meaning of Title
26 | 18, United States Code, Section 2510(7); that is, an officer of the United States, who is
27 | empowered by law to conduct investigations of and to make arrests for offenses enumerated
28 | in Title 18, United States Code, Section 2516. I am a Special Agent with the Federal Bureau
    of Investigation (FBI) and I have been so employed since September of 2017. Previously,
    I was a commissioned officer in the United States Coast Guard. I am presently assigned to

the Cross Border Violence Task Force (CBVTF).   The CBVTF investigates crimes committed by drug trafficking organizations (DTOs) and I have been involved in numerous investigations involving individuals and criminal organizations involved in drug trafficking and money laundering.  Prior to my assignment with the CBVTF, I completed the 21-week FBI Academy and was trained in investigative techniques, procedures, and strategies.  I have also received specialized training in transnational organized crime and money laundering techniques utilized by the DTOs.

5.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.     Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b.     Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c.     Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d.     Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e.     Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f.     Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g.     The use of cellular telephones by conspirators or drug smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social

2

1 network data, and location data.

2       6.     Subscriber Identity Module (SIM) Cards, also known as subscriber identity

3 modules, are smart cards that store data for GSM cellular telephone subscribers.  Such data

4 includes user identity, location and phone number, network authorization data, personal

5 security keys, contact lists and stored text messages.  Much of the evidence generated by a

6 smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been

7 utilized in connection with that telephone.

8       7.     Based upon my training and experience as a Special Agent, and consultations

9 with law enforcement officers experienced in narcotics smuggling investigations, and all

10 the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can

11 and often do contain electronic records, phone logs and contacts, voice and text

12 communications, and data such as emails, text messages, chats and chat logs from various

13 third-party applications, photographs, audio files, videos, and location data.  This

14 information can be stored within disks, memory cards, deleted data, remnant data, slack

15 space, and temporary or permanent files contained on or in the cellular/mobile telephone.

16 Specifically, I know based upon my training, education, and experience investigating these

17 conspiracies that searches of cellular/mobile telephones yields evidence:

18       a.     tending to indicate efforts to import marijuana or some other federally

19 controlled substances from Mexico into the United States, or possess and/or transport with

20 the intent to distribute federally controlled substances within the United States;

21       b.     tending to identify accounts, facilities, storage devices, and/or services–

22 such as email addresses, IP addresses, and phone numbers–used to facilitate the importation

23 of marijuana, or some other federally controlled substances from Mexico into the United

24 States, or possession and/or transportation with the intent to distribute federally controlled

25 substances within the United States;

26       c.     tending to identify co-conspirators, criminal associates, or others

27 involved in importation of marijuana, or some other federally controlled substances from

28

1  Mexico into the United States, or possession and/or transportation with the intent to
2  distribute federally controlled substances within the United States;

3        d.    tending to identify travel to or presence at locations involved in the
4  importation of marijuana, or some other federally controlled substances from Mexico into
5  the United States, or possession and/or transportation with the intent to distribute federally
6  controlled substances within the United States, such as stash houses, load houses, or
7  delivery points;

8        e.    tending to identify the user of, or persons with control over or access to,
9  the subject telephone; and/or

10        f.    tending to place in context, identify the creator or recipient of, or
11  establish the time of creation or receipt of communications, records, or data involved in the
12  activities described above.

13  ## FACTS SUPPORTING PROBABLE CAUSE

14      8.    The facts supporting probable cause are known to me based on my review of
15  documents, reports, and evidence related to this case, as well as consultation with federal
16  law enforcement agents who interviewed JOHN LEE BISHOP ("BISHOP").

17  **A.    Introduction/Overview**

18      9.    On January 4, 2017, BISHOP participated in an interview with federal and
19  state law enforcement in Vancouver, Washington. BISHOP reported that drug traffickers
20  in Mexico offered him money to smuggle drugs into the United States. BISHOP inquired
21  about becoming an informant based on his knowledge of drug trafficking activities.
22  BISHOP was never signed up as a cooperator.

23      10.    On December 11, 2017, BISHOP was arrested at the San Ysidro Port of Entry
24  after 127.86 kilograms (281.88 pounds) of marijuana were found inside the vehicle he was
25  driving. BISHOP's cell phone (**Target Device**) was seized incident to his arrest.

26      11.    BISHOP was charged with importation of marijuana in Case No. 18-CR-94-
27  BTM. On February 8, 2018, BISHOP pled guilty to the charge.

28

12.     On May 8, 2018, BISHOP participated in a Safety Valve interview, during which he gave statements inconsistent with his January 4, 2017 interview.

**B.     Bishop Reports to Law Enforcement About Pelon**

13.     On January 4, 2017, BISHOP was interviewed by federal and state law enforcement officers assigned to the FBI's Safe Streets Task Force in Vancouver, Washington. During that interview, which was initiated by BISHOP in an effort to provide information he possessed regarding "drug dealers in Vancouver, WA and Mexico," BISHOP detailed a relationship he had with an individual named Victor Pelon. According to BISHOP's statements on January 4, 2017, Pelon was a "big dealer" in Mexico who understood the power struggle between the competing cartels. Pelon had a "line of heroin" and desired to both sell heroin, and also move heroin to the U.S. In November 2016, Pelon asked BISHOP to smuggle two (2) kilograms of heroin across the Mexico border into the U.S. Pelon offered to pay BISHOP $10,000 to transport the narcotics into the U.S. BISHOP and Pelon discussed the heroin off and on for two months. Pelon also asked BISHOP to (separately) pick up heroin in the U.S. and transport it "north." BISHOP did not tell Pelon he *would* transport the drugs, and he did not tell him he *would not* conduct the transport(s). BISHOP advised the interviewing law enforcement officers that he thought about trafficking the drugs across the border based upon the large payment he was offered ($10,000); however, in the end, BISHOP stated he decided not to do it. During the same interview, and just a short time later, BISHOP advised he and a Vancouver, WA resident Scott Hood devised a plan wherein BISHOP would traffic Pelon's heroin into the U.S., and BISHOP would subsequently sell the heroin to Hood for $20,000.

14.     BISHOP inquired as to how he could be "hired" to work for the Task Force, and whether money would be involved. He believed Scott Hood told others that BISHOP would be the new source of supply in the Vancouver, Washington area. BISHOP was never asked to subsequently assist law enforcement in a confidential human source capacity.

15.     In the January 4, 2017 interview, BISHOP advised law enforcement officials that he communicated with Pelon via telephone and WhatsApp text message. BISHOP

5

allowed the law enforcement officials at the interview to take a photograph of a fraction of his cellular telephone contact list that included numerous telephone numbers listed under "Victor Pelon", and similar spellings of the name. BISHOP also allowed agents to observe and take photographs of images sent to him by Victor Pelon via WhatsApp text message; the images were date stamped "11/16/2016." BISHOP confirmed the images were sent to him by Pelon, and that they depicted heroin.

16. Additionally during the January 4, 2017 interview, and against law enforcement officers' requests, BISHOP placed a call to one of the telephone numbers listed under Victor Pelon's name in his cell phone, demonstrating his familiarity and close relationship with Pelon. The call was heard by officers as connecting to an international network; however, the call went unanswered.

## C.   Bishop Arrested for Importation of Marijuana

17. On December 11, 2017, at approximately 5:25 A.M., BISHOP applied for admission into the United States from Mexico through the San Ysidro, California Port of Entry (POE) through the Secure Electronic Network for Travelers Rapid Inspection (SENTRI)/dedicated commuter lane #6. BISHOP was the driver, registered owner, and the sole visible occupant of a 2014 gray Volkswagen Passat, VIN: 1VWAP7A36EC003442, bearing California license plate 7SQT602 ("the vehicle"). A Customs and Border Protection Officer (CBPO) conducted a pre-primary inspection using a vehicle inspection mirror (used to look beneath the undercarriage of vehicles without having to kneel and bend down to search) and noticed a reflection on the rear undercarriage. The CBPO approached BISHOP and instructed him to turn off the ignition. BISHOP indicated he had nothing to declare from Mexico. After being asked about his SENTRI privilege, BISHOP stated he possessed his SENTRI for only a short period, but he had been in the Global Entry System for quite some time. The CBPO advised BISHOP his vehicle would be subjected to a cursory inspection. The CBPO then physically inspected underneath the rear of the vehicle and noticed a black rag wedged between the bottom of the vehicle and the aerodynamics undercover. The CBPO utilized an 8" screwdriver to search the wedged area and pushed

against what felt like a package.  The CBPO and a second CBPO opened the trunk and observed cellophane wrapped packages in the vehicle's wheel well.

18.    At that point, the CBPO questioned BISHOP about his travel plans.  BISHOP advised he was on his way to visit a church in Chula Vista, California.  The CBPO asked BISHOP whether he was the only person with access to the vehicle.  BISHOP confirmed that he was the sole individual with access.

19.    BISHOP was subsequently secured and escorted by the CBPO to the security office.  While being escorted, BISHOP stated that he was not the only person with access to the vehicle, and that the vehicle did not belong to him.

20.    A CBP Canine Enforcement Officer responded to the scene and screened the vehicle with the assigned Narcotics Human Detection Dog.  The NHDD alerted to the rear undercarriage and the trunk of the vehicle.  The vehicle was then driven to the secondary inspection area for further inspection.

21.    A separate CBPO was assigned to conduct a secondary inspection of BISHOP's vehicle.  When the CBPO opened the trunk and lifted the wheel well cover, he discovered multiple cellophane wrapped packages within.  The packages were located throughout the vehicle, to include a non-factory compartment behind the rear backseat.  One randomly selected package was probed and field-tested positive for the characteristics of marijuana.

22.    A total of one hundred five (105) packages, with an aggregate weight of 127.86 kilograms (281.88 pounds) were removed from BISHOP's vehicle.  The packages were in a vacuum-sealed bag, wrapped with brown packing tape, dryer sheets, cellophane wrap and foil.

23.    At approximately 8:52 A.M., BISHOP was placed under arrest for the Importation of a Controlled Substance.

24.    At the outset of his post-arrest interview (initiated at approximately 10:06 A.M.), CBP documented that BISHOP was lucid and did not appear to be ill, intoxicated, or under the influence of drugs.  He was alert, responsive, and appeared capable of

7

1  communicating.  He did not appear to be unusually nervous or fearful.  After being advised

2  of his rights, BISHOP elected to have the benefit of counsel present prior to providing a

3  statement or participating in an interview.  At that time, the interview ended.

4       25.    At arrest, BISHOP did not provide consent to search his cellular telephone

5  **(Target Device).** The telephone was seized by CBP.

6       26.    On February 8, 2018, BISHOP pleaded guilty to violations of Title 21, U.S.C.,

7  Sections 952 and 960.  His sentencing is currently scheduled for June 22, 2018.

8  **D.    Bishop's Safety Valve Interview**

9       27.    On May 8, 2018, BISHOP participated, in the presence of his defense counsel,

10  in a "safety valve" interview at the Office of the United States Attorney, Southern District

11  of California. An Assistant United States Attorney, a FBI Special Agent, and a FBI Forensic

12  Accountant conducted the interview.  During said interview, BISHOP advised he utilized

13  the **Target Device** to communicate with individuals involved in his drug trafficking

14  activities**.**  BISHOP confirmed he made/received voice calls, sent/received text messages,

15  and communicated over WhatsApp (a messaging and Voice Over Internet Protocol

16  ("VoIP") application installed on the **Target Device)** with those individuals.  Furthermore,

17  BISHOP advised that in April 2016, he was first approached and asked by an individual

18  associated with a Mexican drug cartel to traffic narcotics over the U.S./Mexico border.

19  BISHOP admitted to transporting controlled substances across the border on fifteen (15)

20  separate occasions between April 2016 and December 11, 2017.  BISHOP utilized the

21  **Target Device** to communicate with individuals involved in the drug trafficking, not only

22  before, but during and after the actual trafficking events, and until his arrest on December

23  11, 2017. BISHOP said he was sent WhatsApp text messages after crossing the border

24  indicating the location to transport the narcotics; those text messages were sent by

25  individuals whose exact identities are currently unknown to the investigation. BISHOP

26  conceded to the interviewers that he did not delete text messages on his cellular telephone

27  despite specific instruction by DTO to do so.

28

8

28.     A review of BISHOP's border crossing records shows he crossed the U.S./Mexico border over fifty-seven (57) times between January 24, 2017 and December 11, 2017, utilizing the SENTRI/Dedicated Commuter Lane.  He had approved SENTRI access to do so as the sole driver of the aforementioned 2014 VW Passat; the same 2014 VW Passat he used to conceal and attempt to transport the marijuana over the border just prior to his arrest on December 11, 2017.

29.     While participating in the Safety Valve interview on May 8, 2018, BISHOP provided written consent to search the **Target Device**; however, he limited said consent to the following: a search of the "iPhone 7S Plus for text messages and phone calls between April of 2016 up to the date of arrest with 'Memo,' 'Ephrem,' 'Pablo,' and 'Andreas Sosa.'"

30.     According to BISHOP, "Memo" and "Ephrem" are names referring to the same individual.  Furthermore, BISHOP stated that Memo/Ephrem, Pablo, and Andreas Sosa are all members of the New Generation Mexican Cartel ("Cartel").  BISHOP identified Sosa as the individual who initially approached him in April 2016, and provided BISHOP with the opportunity to traffic narcotics across the U.S./Mexico border for the Cartel.

31.     During the May 8, 2018 Safety Valve Interview, BISHOP refused to include "communications to/from Victor Pelon" in his limited consent to search the **Target Device**, advising, "I don't know much about him, he's just my son's friend."  BISHOP further advised Pelon was his son's roommate in Cabo San Lucas, Mexico.  Most notably, BISHOP told the FBI and the Assistant United States Attorney that he and Pelon never discussed drugs, and that Andreas Sosa was the only individual who ever approached him and asked him to transport narcotics over the border.

32.     BISHOP's statements about Pelon during the May 8, 2018 Safety Valve Interview were inconsistent with his January 4, 2017 statements regarding Pelon's involvement in drug trafficking.  Because of this discrepancy, during the Safety Valve Interview, BISHOP was repeatedly asked whether he had ever spoke, interviewed with, had a conversation, met, or talked to law enforcement about his knowledge of DTOs, cartels, and drug smuggling.  BISHOP responded "no," and claimed he "never" had a conversation

1  with law enforcement about drugs and cartels.   At the Safety Valve, BISHOP never

2  acknowledged his January 4, 2017 interview or the statements he made about Pelon.

3     33.   Subsequently, on May 16, 2018, BISHOP provided a written statement

4  apologizing for not telling the truth at the Safety Valve:  "Mr. Bishop is incredibly sorry for

5  this, and he acknowledges that he did reach out to TFO Campbell on January 4, 2017, to

6  meet in hopes of becoming an informant and provide information on people he knew that

7  were involved in drug trafficking in Vancouver, Washington, and Mexico."   Although

8  BISHOP claimed he now "remembered" the January 2017 meeting, he did not give any

9  information about Pelon or explain his earlier statements about Pelon in his written

10 statement.

11 **E.    Conclusion**

12     34.   Based upon my experience investigating narcotics traffickers and the particular

13 investigation in this case, I believe that the **Target Device** was used to coordinate the

14 importation of marijuana, and possibly other controlled substances, into the United States.

15 In addition, I know that recent calls made and received, telephone numbers, contact names,

16 electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other

17 digital information are stored in the memory of the **Target Device** may identify the persons

18 involved in narcotics trafficking activities, including BISHOP.   Furthermore, it is likely the

19 **Target Device** may contain incriminating information pertaining to the smuggling event.

20 Accordingly, based upon my experience and training, consultation with other law

21 enforcement officers experienced in narcotics trafficking investigations, and all the facts

22 and opinions set forth in this affidavit, I believe that information relevant to the narcotics

23 smuggling activities of BISHOP, such as telephone numbers, made and received calls,

24 contact names, electronic mail (e-mail) addresses, appointment dates, messages, deleted

25 messages/data, application communication data (Voice over Internet Protocol applications),

26 pictures and other digital information are stored in the memory of the **Target Device**.

27     35.   Finally, I also know that narcotics trafficking activities entail intricate planning

28 to successfully evade detection by law enforcement.   In my professional experience, this

1    requires planning and coordination in the weeks and often months prior to the event.  This

2    planning often includes coordination on crossing the border to develop a crossing history or

3    pattern.

## METHODOLOGY

5        36.    It is not possible to determine, merely by knowing the cellular/mobile

6    telephone's make, model and serial number, the nature and types of services to which the

7    device is subscribed and the nature of the data stored on the device.  Cellular/mobile devices

8    today can be simple cellular telephones and text message devices, can include cameras, can

9    serve as personal digital assistants and have functions such as calendars and full address

10   books and can be mini-computers allowing for electronic mail services, web services and

11   rudimentary word processing.  An increasing number of cellular/mobile service providers

12   now allow for their subscribers to access their device over the internet and remotely destroy

13   all of the data contained on the device.  For that reason, the device may only be powered in

14   a secure environment or, if possible, started in "flight mode" which disables access to the

15   network.  Unlike typical computers, many cellular/mobile telephones do not have hard

16   drives or hard drive equivalents and store information in volatile memory within the device

17   or in memory cards inserted into the device.  Current technology provides some solutions

18   for acquiring some of the data stored in some cellular/mobile telephone models using

19   forensic hardware and software.  Even if some of the stored information on the device may

20   be acquired forensically, not all of the data subject to seizure may be so acquired.  For

21   devices that are not subject to forensic data acquisition or that have potentially relevant data

22   stored that is not subject to such acquisition, the examiner must inspect the device manually

23   and record the process and the results using digital photography.  This process is time and

24   labor intensive and may take weeks or longer.

25       37.    Following the issuance of this warrant, I will subject the Target Device to

26   analysis.  All forensic analysis of the data contained within the telephone will employ search

27   protocols directed exclusively to the identification and extraction of data within the scope

28   of this warrant.

38.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.  The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

39.    Based on all of the facts and circumstances described above, there is probable cause to conclude that the **Target Device** was used to facilitate violations of Title 21, United States Code, Section(s) 952, 960 and 963.

40.    Because the **Target Device** was seized during the investigation of BISHOP's smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by BISHOP continues to exist on the **Target Device**.  As stated above, BISHOP claimed he was first asked to traffic narcotics over the U.S./Mexico border in April 2016.  I believe that the date range for this search is from April 1, 2016, up to and including December 11, 2017, when he was arrested for attempting to smuggle marijuana into the United States.

41.    WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A and the seizure of items listed in Attachments B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

SEAN KELLY
Special Agent

Subscribed and sworn to me before this ____|____ day of June, 2018.

United States Magistrate Judge

12

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following property is to be searched:

> One Apple I-Phone 7, black
> Model A1784
> FCC ID: BCG-E3092A
>
> **(Target Device)**

**Target Device** is currently held as evidence by the Federal Bureau of Investigation, San Diego Division, Evidence Control Unit, located at 10385 Vista Sorrento Parkway, San Diego, California 92121.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below.  The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 1, 2016 through December 11, 2017.

  a.    tending to indicate efforts to import marijuana, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

  b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of marijuana, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

  c.    tending to identify co-conspirators, criminal associates, or others involved in importation of marijuana, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

  d.    tending to identify travel to or presence at locations involved in the importation of marijuana, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points;

  e.    tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

  f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.